No. 16-1089

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

JOSEPH PHELPS VINEYARDS, LLC,

Appellant,

v.

FAIRMONT HOLDINGS, LLC,

Appellee.

APPEAL FROM THE
UNITED STATES PATENT AND TRADEMARK OFFICE
TRADEMARK TRIAL AND APPEAL BOARD
CANCELLATION NO. 92057240

INITIAL BRIEF OF APPELLANT

(Non-Confidential)

Thomas Schneck
Law Offices of Thomas Schneck
80 S. Market Street, 3rd Fl.
P.O. Box 2-E
San Jose, CA 95109
(408) 297-9733
tschneck@patentvalley.com

Attorney for Appellant                        Date November 17, 2015:

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Joseph Phelps Vineyards, LLC    **v.**    Fairmont Holdings, LLC

Case No.    16-1089

## CERTIFICATE OF INTEREST

Counsel for the ~~(petitioner)~~ (appellant) ~~(respondent) (appellee) (amicus)~~ (name of party)
Joseph Phelps Vineyards, LLC    certifies the following (use "None" if applicable; use extra sheets
if necessary):

1.    The full name of every party or amicus represented by me is:

Joseph Phelps Vineyards, LLC

2.    The name of the real party in interest (Please only include any real party in interest
NOT identified in Question 3. below) represented by me is:

Joseph Phelps Vineyards, LLC

3.    All parent corporations and any publicly held companies that own 10 percent of the
stock of the party or amicus curiae represented by me are listed below. (Please list each party
or amicus curiae represented with the parent or publicly held company that owns 10 percent
or more so they are distinguished separately.)

N/A

4.    ☒    The names of all law firms and the partners or associates that appeared for the party
or amicus now represented by me in the ~~trial court or~~ agency ~~or are expected to appear
in this court~~ (and who have not or will not enter an appearance in this case) are:

Jennifer DeArmond of Law Offices of Thomas Schneck

| | |
|---|---|
| October 20, 2015 | /s/Thomas Schneck |
| Date | Signature of counsel |

Please Note: All questions must be answered

cc:    Kim Kolback

Thomas Schneck

Printed name of counsel

Reset Fields

## CERTIFICATE OF FILING USING CM/ECF AND SERVICE

by U.S. Mail and Electronic Transmission

I HEREBY CERTIFY that on this ___20th___ day of ___October, 2015___, I caused this Certificate of Interest to be filed electronically with the Clerk of the Court using the CM/ECF System, with a copy served by U.S. mail and email to:

> Kimberly Kolback
> Law Offices of Kimberly Kolback
> 1395 Brickell Avenue, Suite 800
> Miami, FL 33131
> kim@kkolbacklaw.com

Date: __October 20, 2015_____          _____
                                             Counsel for Appellant

                                             Joseph Phelps Vineyards, LLC


Thomas Schneck
Law Offices of Thomas Schneck
80 So. Market Street, 3rd Floor
P.O. Box 2-E
San Jose, CA 95109
(408) 297-9733
tschneck@patentvalley.com

## TABLE OF CONTENTS

Certificate of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Statement of Related Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

I.      Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.   Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.   Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       1.  About Phelps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
       2.  Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       3.  Efforts to Protect the Phelps INSIGNIA Mark . . . . . . . . . . . . . . . . . . . . 4
       4.  Distinctive Recognition of the INSIGNIA Mark on Wine . . . . . . . . . . . . . 5
       5.  Recognition of INSIGNIA and Notariety in the Industry and Market . . . . . 6
       6.  About Fairmont . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.     Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

VI.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VII.  Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A. The Board Committed Errors in Analyzing Four DuPont Factors . . . . . . . . 12

          1.  Fifth DuPont Factor – The Board Erred in Failing to Assess Strength
             of the Phelps INSIGNIA Mark using a Spectrum of Strength and
             Failing to Determine that the Phelps INSIGNIA Mark had at Least
             a Strong Measure of Strength . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          2.  The First DuPont Factor – The Board Conducted an Erroneous
             Comparison of the Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

             a.  The Board Erroneously Determined What is Fairmont's Mark
                by Overlooking What Fairmont Intended to Register Based
                Upon Fairmont's Specimens of Use Showing Dominant Use of
                INSIGNIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
             b.  The Board's Erroneous Analysis of the Fairmont Mark . . . . . . . . . 18

c.   The Board Failed to use a Scale of Similarity in Comparing
the Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

3.   The Second DuPont Factor – The Board Erred in Requiring a Higher
Standard of Relatedness than What is Required by Law in Finding
that the Goods are Not Similar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

4.   The Eleventh DuPont Factor – The Board Ignored Extensive
Evidence of Phelps Rights to Exclude Others from Using INSIGNIA
on Wine and Related Goods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B.   The Board Erred as a Matter of Law in Finding a Likelihood of Confusion
in Balancing the DuPont Factors, although the Third DuPont Factor,
Similarity of Trade Channels was Determined Correctly . . . . . . . . . . . . . . . 24

VIII.   Clarification of Fame Standard as Fifth DuPont Factor  . . . . . . . . . . . . . . . . . . . 25

IX.   Conclusion and Relief Sought . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Addendum Cover . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Decision of USPTO Trademark Trial and Appeal Board
in Cancellation No. 92057240 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Certificate of Filing and Service  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# TABLE OF AUTHORITIES

**CASES**                                                              Page

Amstar v. Domino's Pizza
615 F.2d 252 (CA5, 1980)                                                14

B&B Hardware v. Hargis Ind.
575 U.S. _____, 135 S.Ct. 1293                                        26

Berg Electronics, In re
163 USPQ 487 (TTAB, 1969)                                               18

Bose Corp., In re
546 F.2d 893 (CCPA, 1976)                                               19

Century 21 Real Estate Corp. v. Century Life of America
970 F.2d 874 (Fed. Cir., 1992)                                        16, 26

Chippendales, In re
622 F.3d 1346 (Fed. Cir., 2010)                                       13, 15

Coors Brewing Co., In re
343 F.3d 1340, 1344 (Fed. Cir., 2003)                                 13, 20

Dial-A-Mattress Operating Corp., In re
240 F.3d 1341, 1345 (Fed. Cir., 2001)                                   19

Duopross Meditech v. Inviro Medical Devices
695 F.3d 1247 (Fed. Cir., 2012)                                       12, 19

DuPont de Nemours & Co., In re
476 F.2d 1357 (CCPA, 1973)                                     1, 11, 14, 25, 26

ECCS, Inc., In re
94 F.3d 1578 (Fed. Cir., 2001)                                          18

GoTo.com v. Disney
202 F.3d 1199, 1207 (CA9, 2000)                                         15

Licores Veracruz, In re
unpublished TTAB decision of January 26, 2012
regarding application serial no. 77753913                        23, Appx 159-169

<u>Morningside Group v. Morningside Capital Group</u>
182 F.2d 133 (CA2, 1999)                                          14

<u>Opus One, Inc., In re</u>
60 USPQ2d 1812, 1814 (TTAB, 2001)                               21, 22

<u>Pacer Tech., In re</u>
338 F.3d 1348, 1349 (Fed. Cir., 2003)                            12

<u>Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772</u>
396 F.3d 1369 (Fed. Cir., 2005)                                  12

<u>Pocono Foods, Inc., In re</u>
Unpublished TTAB decision of July 19, 2000
Regarding application serial no. 74/412,534          19, Appx. 242-244

<u>Restonic Corp., In re</u>
189 U.S.P.Q. 248, 249 (TTAB, 1975)                               19

<u>St. Helena Hospital, In re</u>
774 F.3d 747 (Fed. Cir., 2014)                                   21

<u>Stone Lion Capital Partners, LP v. Lion Capital, LLP</u>
746 F.3d 1317 (Fed. Cir., 2014)                                  26

<u>Wakefern Food Corp., In re</u>
222 U.S.P.Q 76 (TTAB, 1984)                                      19


**STATUTES**

5 U.S.C. 706(2)                                                  12

15 U.S.C. 1052(e), 1052(f)                                     12, 13

15 U.S.C. 1063                                                   25

15 U.S.C. 1064                                                 13, 25

15 U.S.C. 1071(a)                                                1

15 U.S.C. 1125(c)(1)(A)-(H)                                      13

28 U.S.C. 1295(a)(4)(B)                                          1

28 U.S.C. 2107                                                                    1


**CODE OF FEDERAL REGULATIONS**

37 C.F.R. 2.56                                                                    16


**RULES**

Fed. R. App. P. 4(a)                                                              1


**OTHER AUTHORITY**

Gilson on Trademarks                                                25, (Appx. 170)

McCarthy on Trademarks and Unfair Competition            25

USPTO Trademark Manual of Examining Procedure (TMEP)
    TMEP §807                                       16, Applx. 248-249
    TMEP §807.03(a)                               18, Appx. 250
    TMEP §807.12(a)                               18, Appx. 251
    TMEP §904.04(b)                               16, Appx. 252


## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant states as follows:  (1)  Appellant, Joseph Phelps Vineyards, LLC ("Phelps") is not aware of any other appeals in this case; and (2) Phelps is not aware of any other cases that will directly affect or be directly affected by this Court's decision in the pending appeal.

# I. STATEMENT OF JURISDICTION

This is an appeal from the July 6, 2015 final decision (Appx. 1-17) by the Trademark Trial and Appeal Board of the PTO (the "Board") dismissing Appellant Joseph Phelps Vineyards, LLC's ("Phelps") cancellation petition no. 92057240 (Appx. 255-269) against Appellee Fairmont Holdings, LLC's ("Fairmont") trademark registration no. 4,213,619 for the mark ALEC BRADLEY STAR INSIGNIA (Appx. 21) as used on cigars and related goods based on Phelps' rights in federal trademark registration no. 1,123,429 for the mark INSIGNIA as used on wine. (Appx. 22, 23)  Phelps timely filed a Notice of Appeal under 15 U.S.C. 1071(a), 28 U.S.C. 2107 and Fed. R. App. P. 4(a).  This Court has jurisdiction over the appeal under 28 U.S.C. 1295(a)(4)(B).

# II. STATEMENT OF THE ISSUES

The Board determined the likelihood of confusion between Fairmont's mark ALEC BRADLEY STAR INSIGNIA on cigars and cigar related goods, on the one hand, and Phelps mark INSIGNIA on wine, on the other hand, using factors enumerated in In re DuPont de Nemours & Co., 476 F.2d 1357 (CCPA, 1973) ("DuPont factors").  The following issues arise:

A.1. Whether, in analyzing the Fifth DuPont factor, the Board erred in finding that the Phelps INSIGNIA mark is not famous by confusing the Federal Trademark Dilution Act ("FTDA") standard for fame with the sliding scale for fame applicable to the likelihood-of-confusion test under the DuPont test of Federal Circuit law.

A.2. Whether, in analyzing the First DuPont factor, the Board ratified the trademark Examiner's erroneous comparison of marks by considering the specimen of record as evidence of what Fairmont intended to register as opposed to the substantially different word mark ALEC BRADLEY STAR INSIGNIA of the Fairmont application and in determining that INSIGNIA is not a dominant portion of Fairmont's mark as examined and that the marks of the parties are not confusingly similar.

1

A.3. Whether, in analyzing the Second DuPont factor, the Board committed legal error by finding that wine and cigars are not related goods merely because they are used together, but that a higher amount of relatedness is required, and that the case has factual similarity to an unrelated Board case involving wine and cigars where the goods are claimed to be unrelated by a news report of an infringement case.

A.4. Whether, in analyzing the Eleventh DuPont factor, the Board erred by ignoring evidence that Phelps presented regarding exercise of its right to exclude others from use of INSIGNIA on wine or related goods.

B. Whether, when taking all the relevant DuPont factors into consideration, the Board erred as a matter of law in finding no likelihood of confusion between Phelps' INSIGNIA mark for wine and Fairmont's ALEC BRADLEY STAR INSIGNIA mark for cigars and related goods, where the relevant likelihood of confusion factors favor Phelps.

C. Whether the DuPont test for likelihood of confusion should be clarified by requiring a finding of some measure of trademark strength when the fifth DuPont factor is being evaluated.

## III. STATEMENT OF THE CASE

A.    TTAB Proceeding Summary

Phelps has owned the federally registered trademark INSIGNIA for wine since 1978 (reg. no. 1123429). (Appx. 25)   On September 25, 2012, Fairmont received federal registration no. 4,213,619 for ALEC BRADLEY STAR INSIGNIA, with STAR INSIGNIA disclaimed, for cigars and cigar related products (Appx. 21) based upon application ser. no. 85/544,573 (Appx. 173-228) filed on February 16, 2012 (Appx. 5).   Phelps has priority (Appx. 5).

On May 17, 2013, Phelps filed cancellation petition no. 92057240 (Appx. 229-241) in the USPTO against Fairmont's ALEC BRADLEY STAR INSIGNIA registration on the ground that ALEC BRADLEY STAR INSIGNIA is likely to be confused with Phelps prior used, registered, and well-known INSIGNIA mark.   On July 6, 2015 the Board denied

Phelps' cancellation petition (Appx. 17), finding no likelihood of confusion between ALEC BRADLEY STAR INSIGNIA and INSIGNIA.  Phelps filed a timely Notice of Appeal and the PTO certified the record on October 19, 2015. (Appx. 18)

      B.     Evidence in TTAB Proceeding

          1.   Phelps Evidence

          a.   Testimony of William H. Phelps with Exhibits A-L

              described in Phelps testimony          (Appx. 24-27, Appx. 3)

          b.   Notices of Reliance 1-7 described in Phelps

              Main Brief (TTAB) on pages 3-4 and

              by the Board               (Appx. 3, Appx. 71-72)

          2.   Fairmont Evidence

          a.   Testimony of Alan Rubin with Exhibits   (Appx. 107-154, Appx. 3)

          b.   Fairmont Notices of Reliance A-E     (Appx. 3, 4)

          c.   Fairmont Trademark application file     (Appx. 173-226)

## IV. FACTS

1.    About Phelps

     Joseph Phelps Vineyards, LLC ("Phelps") is a family run wine business established by Joseph Phelps in 1973 in the Napa Valley, north of San Francisco.  Phelps is now run by his son, William Phelps. (Appx. 24)

     Phelps testified that the Company started blending red wine grapes in about 1974 including Cabernet Sauvignon and other Bordeaux grape varieties from different Napa Valley locations, with one blend named INSIGNIA in 1974 that had the highest quality Cabernet Sauvignon grapes available locally.  Phelps Cabernet Sauvignon grape sources of Phelps are considered by many wine experts to be the most desirable sources in the world. (Appx. 24, 25)

     1974 INSIGNIA wine was released for sale in the spring of 1978 with several hundred cases (each case having 12 bottles) being sold across the United States over the next few years.  A federal Certification of Label Approval was granted January 9, 1978 to Phelps for INSIGNIA wine. (Appx. 25)

     A federal trademark application to register INSIGNIA in the U.S. Patent and Trademark Office ("USPTO") was filed in July, 1978 on behalf of Stone Bridge Cellars,

Inc., a predecessor of Phelps.  At that time, Stone Bridge Cellars, Inc. used the fictitious business name of Joseph Phelps Vineyards and this was explained to the USPTO.  A federal registration for INSIGNIA issued on July 31, 1979.  In 1998 the INSIGNIA mark and goodwill were assigned to Joseph Phelps Vineyards, a California corporation, with the assignment recorded in the USPTO.  In 1999 a first renewal certificate issued.  In 2005, the corporation assigned the INSIGNIA mark to Joseph Phelps Vineyards LLC (Phelps herein), with the assignment being recorded in the USPTO.  In 2009 a second renewal certificate issued to Phelps. (Appx. 25)

Phelps' INSIGNIA mark, used on wine, is sold in commerce today and in prior years using INSIGNIA labels on wine bottles, with representative specimen wine labels spanning years 1979-2004. (Appx. 30-38)

2.      Sales

Since 2000 annual U.S. sales of wine bearing the INSIGNIA trademark have ranged between 10,000 to 15,000 cases per year representing revenue between $13 million to $20 million per year.  (Appx. 25)   Sales of INSIGNIA wine are through wine distributors, directly to house accounts that are mainly restaurants and bars, through a Phelps Wine Club having thousands of members, and through a company store at the Phelps winery. (Appx. 26)  Wine distributors sell mainly to stores, restaurants, hotels, bars and other retailers.

Phelps has had a website for its wines for at least 10 years.  Presently, the website is www.josephphelps.com.  During this time, the website has had historical and wine product information, particularly regarding INSIGNIA wine. (Appx. 26)  The website now includes a shopping cart for wine that receives over 17,000 unique visitors per month on average. (Appx. 26)

3.      Efforts to Protect the Phelps INSIGNIA Mark

William Phelps testified that over the years, Phelps has successfully opposed registration of marks that were confusingly similar for the same or related goods. (Appx. 26) Oppositions were filed against other parties as follows:

Mead Westvaco Packaging Systems, LLC for use of Insignia on paper packaging products in 2007, Opposition No. 91177073.

Smithtown Steakhouse LLC for an intent-to-use "I Insignia Prime Steak: Sushi" and design on restaurant and bar services in 2011, Opposition No. 91205206.

CSC Brands for use of Insignia on soup, in 2007, Opposition No. 91179395 and Cancellation No. 92048450.

Tony Borhani for use of Insignias on cigars in 2013, Opposition No. 91210337.   A case summary was provided by Fairmont. (Appx. 39, fn 8)

In addition to oppositions, Phelps has written cease and desist letters to persons who were seen to be using confusingly similar marks for the same or related goods. Representative letters were in Exhibit E of the Phelps testimony. (Appx. 40-61)


4.    Distinctive Recognition of the INSIGNIA Mark on Wine

WINE SPECTATOR is a popular monthly magazine for wine lovers with national and international circulation.  WINE SPECTATOR is often sold at retail shops that sell wine, as well as in grocery stores and news magazine vendors. (Appx. 27)  WINE SPECTATOR has a Wine of the Year award.  Phelps testified (Appx. 27) that 2002 INSIGNIA won a 2005 WINE SPECTATOR wine of the year award. (Appx. 62)    WINE SPECTATOR is considered to be the most widely read wine industry publication.  (Appx. 27)  This is huge notoriety in the industry, among wine consumers and the press.  Phelps testimony included a WINE SPECTATOR article (Appx. 64) about an 1994 INSIGNIA that won a WINE SPECTATOR 1998 Wine of the Year award, the article noting that the editors tasted over 10,000 wines in 1997.  Among thousands of wines sold in America, the repeated Wine of the Year awards to Phelps INSIGNIA wine are evidence of notoriety of the INSIGNIA mark on wine.

William Phelps testified that INSIGNIA has been served in the White House at State dinners.  The following papers are in evidence from Exhibit F to his testimony.


(Appx. 65)                    *The White House* dinner menu honoring Jean
                             Chretien Prime Minister of Canada, March 14, 2002
                             with 1994 Phelps INSIGNIA.


(Appx. 66)                    *The White House* Holiday dinner menu dated
                             December 1, 2006 with 2002 Joseph Phelps INSIGNIA.

(Appx. 67 – 68)          Correspondence from the *The White House* dated
                         March 4, 2001 addressed to Mr. Joseph Phelps
                         enclosing head of State dinner menu for February 5, 2001.
                         The letter, signed by D. Shanks, Usher's Office, states "We
                         selected the Phelps "Insignia"… The wine's elegant fruit and
                         seamless structure shows very well.  It is a personal honor to
                         serve Joseph Phelps wines in the Executive Residence." The
                         menu lists 1994 Joseph Phelps "INSIGNIA".

(Appx. 69 - 70)          President's Invitation to *The Governors of the*
                         *States and Territories* dated February 22, 1998
                         enclosing dinner menu and program for the evening
                         with 1994 Phelps INSIGNIA.

5.      Recognition of INSIGNIA and Notariety in the Industry and Market

        William Phelps testified that dozens, if not hundreds, of articles have appeared over
the years describing Phelps' INSIGNIA wine. (Appx. 30)  Dozens and dozens of listed
articles (Appx. 104-110), many from the internet, are in Exhibit H of the Phelps testimony.
Selected articles from his testimony are as follows:

(Appx. 73)      Washington Post, February 24, 1999
                Wine column by B. Giliberti
                "Joseph Phelps 1995 INSIGNIA ($75)
                "Incredible from the first sniff, the only thing I am sure of is that this is a
                terrific wine."

(Appx. 74)      Baltimore Sun, April 14, 1996 by M. Dresser
                "Fireworks explode at tasting for '94 Joseph Phelps INSIGNIA"…
                "But even amid the abundance of excellent wines on show at the
                MacArthur tasting, the Insignia stood out…. In more than a decade of
                attending MacArthur barrel tastings, this was the finest wine I had ever
                encountered."

(Appx. 75)      Valley Times, Pleasanton, California by L. Daniel, March 8, 2000
                Classic Wines started proprietary trend
                "The granddaddy of these so-called proprietary wines is Insignia,
                introduced by Joseph Phelps Vineyards with the 1974 vintage."

(Appx. 76)     Wine-reviewonline.com – Search Report regarding INSIGNIA
No. 98 by Robert Whitley, November 7, 2006
Joseph Phelps INSIGNIA
"The '02 was named Wine of the Year by The Wine Spectator, and
deserved every accolade it received. But I am convinced the '03 will be a
better wine over time."

(Appx. 78-79) Wine Enthusiast Magazine, December 31, 2012, p. 96
Joseph Phelps 2009 INSIGNIA
"This wine continues a long standing tradition, showing a mastery of the art
of blending."

(Appx. 79-81) The Wall Street Journal, March 16, 2012 by L. Teague
Savoring Napa's Most Reliable Cabernets
"Favorite Vintage: 1994 Phelps INSIGNIA, $70 on release.
A full-bodied, generous, gorgeous wine that manages to taste youthful as
well."

(Appx. 82-83) Foodandwine.com, Winemaking, October 2011, p. 150
Why Blending Matters
"Insignia was the first Bordeaux blend produced in the Napa Valley… and
it's still one of the most famous."  (It's also one of the best.)"

(Appx. 84-86) Clear reprint of above, not in record

(Appx. 87-88) The Capital Hometown Annapolis.com, February 1, 2012
by T. Maronarot and P. Darr
Joseph Phelps Napa Valley Insignia 2008 ($200)
"From one of the most respected procedures in the Napa Valley, this
colossal blend… is a wine that will last for decades."

(Appx. 89)     The New York Times, October 13, 1993 – Wine Talk
"Last week, the Insignias reflected different blends… for me, the 1984,
1985, 1990 and 1991 vintages were particularly outstanding."

(Appx. 90)     California Grapevine, Vol. 35, No. 5, October 2009, p. 65
2006 Joseph Phelps INSIGNIA
Very highly recommended. My score 92/100, first place.

(Appx. 91)    Quarterly Review of Wines, Summer 2010, p. 47
California Cabernets and Red Blends
Co-Best of the Show – 2006 Joseph Phelps INSIGNIA


(Appx. 92)    Quarterly Review of Wines, Winter 2009/2010, p. 75
An Iconic Tasting
1st Place: Phelps INSIGNIA
"… it's a personal winner at our annual Best of the Best in California."


(Appx. 93)    Quarterly Review of Wines, Summer 2009, p. 42
Five Star California Red Blends
Co-Best of the Show – 2005 Joseph Phelps INSIGNIA


(Appx. 94)    Wine Spectator Insider, August 8, 2007, Vol. 3, No. 18, cover
Joseph Phelps – INSIGNIA Napa Valley 2004
Deftly balanced… you can taste the depth and richness.


(Appx. 95)    Wine News, December/January 2007-08, cover
Proprietary Blend of the Year
Joseph Phelps, 2004 INSIGNIA


(Appx. 96)    California Grapevine, Vol. 33, No. 5, October-November 2007
2004 Joseph Phelps INSIGNIA
Very high recommended. My score 93/100, first place.


(Appx. 97)    eRobertParker.com, The Wine Advocate #195, June 2011
"The sensational, prodigious 2001 INSIGNIA Proprietary Red Wine… has
never performed better".


(Appx. 98)    eRobertParker.com, The Wine Advocate #204, December 2012
"The 2010 INSIGNIA is striking."


(Appx. 99)    San Jose Mercury News, October 13, 1993 – The Wine Page
"Joseph Phelps Vineyards released its 1974 Insignia in the spring of
1978… But the real excitement is with the 1990-1991 samples.  These
wines have extremely long finishes and superb balance that bodes well for
the future."

6.    About Fairmont

Fairmont is a holding company, holding 100 trademarks (Appx. 107, 111-113), including marks for its affiliate Alec Bradley Cigar Distributors, Inc. (Appx. 107) Fairmont attempted to register INSIGNIA for cigars and cigar related products (Appx. 107) but was opposed by Brohani (Appx. 108, fn 1) who had a registration for INSIGNIAS on cigars. Fairmont abandoned this application. (Appx. 108, fn 1)  Phelps successfully opposed Brohani's INSIGNIAS registration for use of INSIGNIAS on cigars (Appx. 26, Appx. 39, fn 8) in opposition proceeding no. 91210337.    Fairmont attained trademark reg. no. 4,213,619 for ALEC BRADLEY STAR INSIGNIA on cigars and cigar related products in 2012 (Appx. 109, 173) submitting a design mark as a specimen of use in commerce. (Appx. 195, 196, 222, 223)  The registration (Appx. 173) states "The mark consists of standard characters without claim to any particular font, style, size or color."  The registration also has the following disclaimer "No claim is made to the exclusive right to use 'Star Insignia'," apart from the mark as shown.

Fairmont, through distributors, sells cigars with its ALEC BRADLEY STAR INSIGNIA mark on the internet (Appx. 109) with its registered mark just as Phelps sells wine with its INSIGNIA mark on the internet. (Appx. 26)


**V.    SUMMARY OF ARGUMENT**

There is a likelihood of confusion between INSIGNIA and ALEC BRADLEY STAR INSIGNIA when the relevant DuPont factors are properly weighed and considered in light of the law and record evidence.  On the merits, the Board found that four DuPont factors (*i.e.*, fame, similarity of the marks, relatedness of the goods and the right to exclude others from use) weighed in favor of no likelihood of confusion. The Board's opinion below rested on legal and factual errors that affected its entire DuPont analysis.  Had the Board applied the DuPont factors properly to the factual evidence, a result in clear favor of a finding of a likelihood of confusion would have resulted.

The Board abandoned fundamental principles of trademark law when it wrongly applied a binary definition of fame and when it completely failed to make any finding of strength regarding the Phelps INSIGNIA mark in its likelihood of confusion analysis, rather finding that Phelps INSIGNIA mark is not a famous mark. The Board confuses "success in

the marketplace" with trademark strength and further confuses "famous mark" with the binary (either/or) standard of fame of the Federal Trademark Dilution Act. This error biased the Board's analysis of the similarities between the parties' marks and the relationship of the goods. Bias unfavorable to Phelps occurs because lack of fame implies little or no trademark strength and lack of strength restricts the scope of the INSIGNIA mark, including the relationship of the goods, similarities of the marks and other factors. The entire likelihood of confusion calculus becomes skewed against Phelps. This is not a case where the fame factor is neutral, having been weighed for strength. The Board did not say it was a neutral factor. Rather this is a case where a binary definition of fame has been wrongly applied by the Board. (Appx. 6-8)  Regarding the fifth DuPont factor, fame, the Board ignored this Court's precedent in the Palm Bay case by finding "while it appears that Petitioner's INSIGNIA mark has met with success in the marketplace, we are not persuaded on this record that Petitioner's mark is a famous mark". (Appx. 8)

The Board ignored that the trademark specimen (Appx. 195) in the trademark prosecution for ALEC BRADLEY STAR INSIGNIA and other examples of actual use in the record, such as the internet search document cited by the trademark Examiner (Appx. 203) are to be considered when determining similarity of the marks. The Board started its analysis from the wrong point by stating that because the application for the mark is in standard character format and Respondent is not limited to any presentation, the format in which Respondent currently uses the mark is not in issue. This is a major departure from trademark examination procedure that requires the specimens to be substantially identical to the mark and clear error of such magnitude that Fairmont's registration is invalid. The format in which Respondent uses the mark is in fact in issue. Registration validity is a public policy issue as well as an *inter partes* issue.

The trademark specimen in Fairmont's trademark prosecution (Appx. 195, 196, 222, 223) shows that Fairmont's mark, as evidence that reveals market perception, is actually a design prominently featuring the word INSIGNIA, notwithstanding that Fairmont's registration was for a word mark and not a design. Fairmont's design with emphasis on INSIGNIA is substantially similar to the Phelps INSIGNIA registration. Use of the INSIGNIA design by Fairmont is confirmed by Fairmont's evidence of internet review pictures (Appx. 120-127) from the Rubin testimony which is very similar to the trademark

specimen (Appx. 195). The Trademark Examiner's disclaimer requirement further indicates an erroneous examination of Fairmont's design, not the word mark, an error ratified by the Board.

Where, as here, the parties' goods are related, as argued below, and Phelps' INSIGNIA mark is over 35 years old and strong, the threshold of confusing similarity is met when the newcomer appropriates a respected, distinctive registered mark, as Fairmont did in this case, by incorporating INSIGNIA as a dominant portion of its design trademark.

Similarity of the marks should not be judged in the abstract, or by dissection as done by the Board, but by marketplace perception of the marks, considered as a whole, as the evidence shows. In this case the evidence of similarity is Fairmont's advertising showing labels affixed to its goods, as well as its specimen. In case of doubt, all doubt should be resolved in the senior user's favor, namely that confusion is likely.

Regarding the second DuPont factor, the relatedness of the goods, the Board found such relatedness in use together (Appx. 14) and simultaneous consumption by wine infused cigars (Appx. 13) but erroneously required a higher standard of relatedness, the same marks on both of the goods. (Appx. 14) Even under the Board's higher standard, a fair viewing of the marks as perceived in the marketplace shows that they are substantially identical. The Board cited a non-precedential opinion (Appx. 15) involving restaurant services and seemingly adopted a *per se* rule that wine and cigars are not related based on alleged factual similarity with facts not in evidence from a footnote in this non-precedential Board decision. The evidence in this case shows a strong relatedness of wine and cigars.

Regarding the eleventh DuPont factor, Phelps' right to exclude others from use of the INSIGNIA mark on wine or related goods, the Board ignored evidence submitted by both parties, including oppositions and cancellations by Phelps (Appx. 26, 39) regarding its efforts to exclude others from use of the INSIGNIA mark in a confusingly similar manner.

A rebalancing of the relevant DuPont factors, including channels of trade which the Board weighed in favor of Phelps, heavily favors a finding of no likelihood of confusion and a reversal of the Board's holding.

Lastly, the Board's binary interpretation of the fame factor (Appx. 8) after citing the Palm Bay case, infra (Appx. 6), in its likelihood of confusion analysis may indicate that the legal standard, the DuPont case, <u>In re DuPont de Nemours & Co.</u>, 476 F.2d 1357 (CCPA,

1973), as interpreted in Palm Bay, needs clarification by explicitly indicating that fame is at the end of a sliding scale of strength that is below the level of FTDA fame.

## VI.    STANDARD OF REVIEW

This Court reviews the USPTO Trademark Trial and Appeals Board's factual findings with deference mandated by the Administrative Procedure Act, 5 U.S.C. 706(2). Findings must be supported by substantial evidence.  In re Pacer Tech., 338 F.3d 1348, 1349 (Fed. Cir., 2003), Duopross Meditech v. Inviro Medical Devices, 695 F.3d 1247 (Fed. Cir., 2012).  The substantial evidence standard demands deference to findings that a reasonable mind might accept as adequate to support a conclusion as long as competent evidence in the record supports the Board's ruling.  Conclusions of law are reviewed *de novo*.

## VII.    ARGUMENT

A.    The Board Committed Errors in Analyzing Four DuPont Factors

      1.    Fifth DuPont Factor – The Board Erred in Failing to Assess Strength of the Phelps INSIGNIA Mark using a Spectrum of Strength and Failing to Determine that the Phelps INSIGNIA Mark had at least a Strong Measure of Strength

The Board stated the following test for fame: "Fame for confusion purposes arises as long as a significant portion of the relevant consuming public…recognizes the mark as a source indicator.' Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772, 396 F.3d 1369 (Fed. Cir., 2005)".  Then, after considering some of Petitioner's evidence, the Board stated, "As such, while it appears that Petitioner's INSIGNIA branded wine has met with success in the marketplace, we are not persuaded on this record that Petitioner's mark is a famous mark." (Appx. 8)  From the many news articles, awards, over 35 years use and sales, Phelps does not concede lack of fame because the Phelps INSIGNIA mark on wine is a renown mark within the wine market.  Such renown is an indicator of fame under Palm Bay that is under the level of FTDA fame.  Phelps contends that such fame is at the extreme end of the strength scale and challenges.  The Board suggests that only famous marks can serve as source indicators.  Just the opposite is true, only weak marks, such as merely descriptive marks, cannot serve as registrable source indicators 15 U.S.C. 1052(e) and, even then, with secondary meaning, weak marks can gain moderate strength to

serve as registrable source indicators, 15 U.S.C. 1052(f).  In any case, some measure of strength is necessarily required to gauge the scope of protection for a mark.  Is not the Board finding of "success in the marketplace" for Phelps INSIGNIA wine (Appx. 8) tantamount to recognition of the INSIGNIA mark as a successful source indicator and therefore at least a strong mark, if not a famous mark?  Phelps submits that it is.

The Palm Bay case specifically states, "While dilution fame is an either/or proposition - fame either does or does not exist - likelihood of confusion fame "varies along a spectrum from very strong to very weak", citing In re Coors Brewing Co., 343 F.3d 1340, 1344 (Fed. Cir., 2003).  The Board made no strength finding, except that Phelps had no fame, FTDA or DuPont, which is clear error.

This error biased all other Board findings in this case and occurred when the Board applied fame as an either/or proposition in the manner of the 1996 Federal Trademark Dilution Act (FTDA) fame, finding that the Joseph Phelps mark is not famous.  A finding of lack of fame is erroneous because it ignores the spectrum of trademark strength, a factor that always must be considered.  The spectrum of strength is critical in evaluating the DuPont fame factor and critical to establishing damage to Phelps under 15 U.S.C. 1064 by failing to establish the scope of protection to which the Phelps INSIGNIA mark is entitled.  The Palm Bay case indicates this Court's concern with confusing FTDA fame and fame as a DuPont factor, with different tests being applicable.  The concern arises because under the 1996 Federal Trademark Dilution Act (FTDA), 15 U.S.C. § 1125(c), only "famous" marks are protected.  The FTDA lists eight nonexclusive factors courts are to consider in determining whether a mark is "distinctive and famous", 15 U.S.C. § 1125(c)(1)(A)-(H).

The Palm Bay spectrum for fame is stated in terms of strength of the mark – from the very strong to the very weak.  While the DuPont factors do not explicitly include strength, cases such as Palm Bay interpret fame under DuPont to be tantamount to strength of the mark.  Phelps submits that fame is the uppermost level of strength and that the following factors are relevant for assessing a sliding scale of strength:

1) conceptual strength, i.e., distinctiveness of the mark in its field

2) marketplace strength, i.e., length of use, advertising or notoriety and sales,

In re Chippendales, 622 F.3d 1346 (Fed. Cir., 2010).

13

INSIGNIA as a mark for wine has conceptual strength because it is fanciful, non-descriptive of the goods and protected.  Use of the mark on wine in commerce for at least 35 years is a long use among trademarks for wine.  There is no evidence of third party uses of the INSIGNIA mark.  Although Fairmont argued the existence of third party uses in its TTAB brief, such uses are not in evidence and were not used by the Board.  Further, there is no evidence that any third party marks are in use or have public perception.

While advertising is part of marketplace strength factor, lack of advertising does not translate to a weak mark, Morningside Group v. Morningside Capital Group, 182 F.2d 133 (CA2, 1999).  Moreover, notoriety has been found to be similar to advertising in establishing strength of a mark in the mind of the public, Amstar v. Domino's Pizza, 615 F.2d 252 (CA5, 1980).  Notoriety for INSIGNIA comes from newspaper articles and wine reviews (Appx. 73-99) and wine awards including winning the Wine Spectator "Wine of the Year" multiple times (Appx. 62-64).  This is huge among wine consumers.  Recognition by the White House and at State dinners is evidence of public homage to the INSIGNIA brand, as evidenced by government menus and thank you notes (Appx. 65-70).

The DuPont case parenthetically lists three factors for fame: *sales, advertising and length of use*, 476 F.2d 1357, 1361 (CCPA, 1973), the factors having been termed "strength" of the mark by subsequent cases such as Palm Bay.  Phelps 35 years length of use (Appx. 25) as a fame factor does not appear to have been taken into account nor length of use in comparison to Defendant's registration.

The INSIGNIA mark was first registered in 1978 to the present owners.  The registration was renewed twice (Appx. 25) has been asserted in multiple trademark oppositions (Appx. 26) and continues in force today.  Length of use in comparison to Defendant's use is relevant because a newcomer is under a duty to avoid adopting what could be confusingly similar marks, assuming confusing similarity that will be discussed below.

Rather than finding that Phelps had "success in the marketplace" (Appx. 8), the Board should have focused on the following evidence as indicators of INSIGNIA's market strength:

1. Wine Spectator magazine "Wine of the Year" award for INSIGNIA wine for years 2005, 1998 and 2002. (Appx. 62-64)

2. News articles and wine reviews about INSIGNIA. (Appx. 73-99)

3. Annual sales of $13-$20 million per year for INSIGNIA wine since 2000. (Appx. 25)

4. White House and State Department menus featuring INSIGNIA wine and corresponding thank you notes. (Appx. 65-70)

5. Annual U.S. shipments ranging between 10,000 – 15,000 cases per year since 2000. (Appx. 25)

Thus, the INSIGNIA mark has marketplace strength, as well as conceptual strength, two factors that define overall strength, In re Chippendales, supra; GoTo.com v. Disney, 202 F.3d 1199, 1207 (CA9, 2000), as opposed to "success".

If strength of the mark is calculated as the fifth factor in the DuPont calculus for likelihood of confusion, Plaintiff's strength rating must be at least strong and perhaps famous. Some degree of non-TDMA fame, i.e., strength, must exist as a matter of law and deference should not be given to the Board's erroneous factual determination to the contrary. Phelps makes no claim that such strength alone automatically outweighs other DuPont factors. Nevertheless, strong strength or non-FTDA fame would be an important finding for Phelps because consumers do not associate source with weak marks and because the scope of trademark protection would extend to related goods such as cigars.

2. The First DuPont Factor – The Board Conducted an Erroneous Comparison of the Marks

The Board's inquiry here went to "the recollection of the average purchaser who normally retains a general, rather than a specific impression of trademarks". The Board completely ignored Fairmont's trademark specimen, as well as Fairmont's advertising evidence, in assessing what the average purchaser actually sees, namely a design prominently featuring the word INSIGNIA. While a cancellation is not intended to determine common law rights, there should be a PTO determination of the nature of the actual mark under examination as shown by the specimen. As argued below, the mark under examination was not the word mark of the application.

a.    The Board Erroneously Determined What is Fairmont's Mark by Overlooking What Fairmont Intended to Register Based Upon Fairmont's Specimens of Use Showing Dominant Use of INSIGNIA

One of the findings made by the Board is that in relation to the specimens presented to the Examiner during trademark prosecution is that "the format in which Respondent currently uses its mark is not an issue". (Appx. 9)   Phelps contends that the issue of specimens is huge.

Fairmont's trademark specimen [1](Appx. 195, 196) and Fairmont's evidence to the Board regarding Fairmont's use in commerce (Appx. 145-148) should be available to show public perception of the actual mark, as well as Fairmont's intent.  Fairmont's registration is for a word mark (Appx. 21, 181) and the word mark nature of Fairmont's application is repeated many times in the application file (Appx. 176, 178, 181, 185, 189, 216, 219, 221). Yet, a review of Fairmont's specimen, a design, shows INSIGNIA in bold lettering on a cigar band, with all other words in substantially smaller type face, including the word STAR, as a design mark.  This is in reality Fairmont's mark.   Fairmont's evidence shows that sometimes third parties use STAR INSIGNIA without ALEC BRADLEY. (Appx. 139)  This is marketplace evidence of what is seen by consumers.  The Board's closed eyes toward the chief marketplace evidence regarding Fairmont's use of INSIGNIA as the dominant word of the mark ALEC BRADLEY STAR INSIGNIA on cigar bands applied to cigars and cigar boxes and in advertising is grossly unfair to Phelps.  This disparity between the word mark and the specimen is shown on the following page.

While it is true that the adequacy of specimens is not a ground for cancellation, Century 21 Real Estate Corp. v. Century Life of America, 10 USPQ2d 2034 (TTAB, 1989), the issue of what is the mark and the issue of compliance with 37 C.F.R. 2.56 – use of the mark on the goods – is at issue in this case.  This is not a case involving adequacy of the specimens, but a case of a word mark registration issued for a design mark with prominent use of INSIGNIA in clear violation of TMEP §807 (Appx.248,249)"The mark in the drawing must agree with the mark as used on the specimen in an application under … 15 U.S.C. 1051."

_____

[1] Fairmont's specimen appears to be advertising material.  TMEP §904.04(b) (Appx. 252) provides "Advertising material is generally not acceptable as a specimen for goods".



Fairmont Holdings Specimen (Appx.195)

# ALEC BRADLEY STAR INSIGNIA

Fairmont Holdings Word Mark (Appx.181)

Under TMEP §807.03(a) (Appx. 250) a word mark may not include a design element.   Under TMEP §807.12(a) (Appx.251) "the drawing of the mark must be substantially exact representation of the mark shown on the specimen."  In this case, the mismatch between the word mark drawing and the design specimen,  being  significant TMEP  procedural  violations,  would  indicate  an  invalid registration.

The specimens determine what applicant intended to register, <u>In re ECCS, Inc.</u>, 94 F.3d 1578 (Fed. Cir., 2001).  It is clear from the specimens that Fairmont intended to register INSIGNIA and it is clear from the Rubin testimony of a prior application of Fairmont, trademark application serial no. 85/077,386 for INSIGNIA, filed on July 10, 2010 for use on cigars and cigar related products, later abandoned. (Appx. 107, 155, fn 2)  From this trademark application Fairmont's registration intent is clear beyond doubt when it sought registration of INSIGNIA on cigars and cigar related goods.  Fairmont then intended and now intends to use INSIGNIA on cigars as its mark, as a design, with other word and design elements that disguise its real usage of INSIGNIA.

### b. <u>The Board's Erroneous Analysis of the Fairmont Mark</u>

Predicated on the error of giving no effect to the specimen and other evidence of actual use of the Fairmont mark and Fairmont's intent, the Board conducted an erroneous analysis resulting in an erroneous comparison of the marks.  The Board analyzed Fairmont's mark in terms of a house mark, ALEC BRADLEY, plus what the Board called the "unitary term STAR INSIGNIA".  The house mark ALEC BRADLEY is barely visible in Fairmont's design (Appx. 195) and in industry cigar reviews as shown by the evidence. (Appx. 121-127, 139, 140)  The Board cites no evidence that ALEC BRADLEY would be perceived by the public as a house mark nor evidence that STAR INSIGNIA would be perceived by the public "as a unitary phrase with the word 'star' modifying 'insignia' ".  If indeed "star" modifies "insignia", as stated by the Board, then the significance of "insignia" is increased, not decreased, and "star insignia" would be perceived as a type of INSIGNIA, likely associated with Phelps.  It is true that one may use a composite mark and register an element of the composite but only if the element creates a separate and distinct impression from the other elements.  <u>In re Berg Electronics</u>, 163 USPQ 487 (TTAB, 1969).  No such separate and distinct impression exists in the present situation.  There is no evidence explaining

impressions of the elements.  In the case of <u>In re Pocono Foods, Inc.</u>, unpublished TTAB decision of July 19, 2000 (Appx. 242-244) regarding application serial no. 74/412,534 the Board affirmed a refusal of registration because the application was for the word "SPORTS" and the specimens submitted by applicant showed "CHIC-N-SPORTS-CN".

Fairmont disclaimed "Star Insignia" as part of its mark. (Appx. 21, 191)  While disclaimers have no impact on public perception of a mark, the effect of the disclaimer was removal of "Star Insignia" from scrutiny in the USPTO for purposes of comparison with other marks, such as Phelps INSIGNIA mark.  Office disclaimers are required for non-registrable words in a mark, usually descriptive or generic words.  Indeed, the Board adopted a descriptive interpretation of "Star Insignia" in its review of the specimen (Appx. 10, 11), effectively and incorrectly turning disclaimer practice into a sword for use against Phelps having a registration on INSIGNIA, one of the disclaimed words.  This is a major Board error in not conducting an independent review of examination procedure, brushing aside Phelps complaints about the specimen. (Appx. 9)

Phelps has claimed that INSIGNIA is the dominant portion of Fairmont's registration, as seen by consumers in the marketplace, citing Fairmont's specimen of use and its advertising in evidence.  As noted in <u>Duopross Meditech Corp. v. Inviro Medical Devices</u>, 695 F.3d 1247 (Fed. Cir., 2012)  "The commercial impression that a mark conveys must be viewed through the eyes of a consumer, <u>In re Dial-A-Mattress Operating Corp.</u>, 240 F.3d 1341, 1345 (Fed. Cir., 2001) noting that competent evidence is necessary to demonstrate 'the relevant purchasing public's understanding of a contested term'."  In order to ascertain the manner of use and the commercial impact created by the asserted mark, one looks to the specimens and other examples of actual use of record.  <u>In re Wakefern Food Corp.</u>, 222 U.S.P.Q 76 (TTAB, 1984), <u>In re Bose Corp.</u>, 546 F.2d 893 (CCPA, 1976), <u>In re Restonic Corp.</u>, 189 U.S.P.Q. 248, 249 (TTAB, 1975).

The Board stated (Appx. 10, 11), "Thus, the commercial impression of Opposer's (sic) mark INSIGNIA is simply an 'insignia' or mark, and the commercial impression of Applicant's mark ALEC BRADLEY STAR INSIGNIA is one of a star shaped mark or sign identifying the source of a product produced by ALEC BRADLEY."  The Board's determination of the commercial impression of Fairmont's mark must have been gained from Fairmont's specimen (Appx. 195) and cigar reviews and advertising, noted above, and not

the word mark.  The Board merely echoed a remark of the trademark examiner (Appx. 201) and did not make an independent finding in relation to the mark under examination, namely the words ALEC BRADLEY STAR INSIGNIA.  The Examiner stated (Appx. 201) "this wording [STAR INSIGNIA] describes a feature of applicant's goods (sic)".  A second time the Examiner stated, "…Google shows this wording feature of applicant's cigars (sic) which contains a label featuring a five-point star…."  This makes no sense.  Clearly, the Examiner meant that the wording describes a feature of the design.  Such a lack of review and obvious error of trademark examination and Board ratification is not entitled to deference.

Phelps does not concede that ALEC BALDLEY is a house mark because there is little or no evidence of public perception of ALEC BRADLEY as part of individual marks.  The house mark doctrine, even if it is applicable here, does not rescue ALEC BRADLEY STAR INSIGNIA where the word INSIGNIA is by far the most significant visible portion of its use in the marketplace as shown by the evidence.  The Board committed error by applying its view of the Fairmont design mark to the word mark under consideration.

As happened in the Duopross case, the Board substituted its own view about the commercial impression created by the mark under exam, rather than that of the relevant consumers as supported by the evidence

c.    The Board Failed to use a Scale of Similarity in Comparing the Marks

While Phelps claims the marks used by the parties, as perceived in the market, are substantially identical, but even if the marks are not identical, the similarity of the marks is not a binary factor but judged as a matter of degree In re Coors Brewing Co., 343 F.3d 1340 (Fed. Cir., 2003).  The Board failed to consider degrees of similarity between the marks, finding only non-similarity. (Appx. 11)

Under these circumstances, the Board's findings in this factor cannot be given deference.  The evidence shows that the first DuPont factor clearly weighs in favor of Phelps.

3. <u>The Second DuPont Factor – The Board Erred in Requiring a Higher Standard of Relatedness than What is Required by Law in Finding that the Goods are Not Similar</u>

The Board found that "use together" of wine and cigars (Appx. 14), with complementarity, while existing, were insufficient to establish relatedness and applied a test similar to the "something more" rule that is usually required for relatedness of goods and services, <u>In re St. Helena Hospital</u>, 774 F.3d 747 (Fed. Cir., 2014). The higher standard of relatedness that the Board required is "evidence of use of the same mark on both cigars and wine" (Appx. 14), a higher standard of relatedness than established by case law, since case law only requires confusing similarity. The Board's relatedness standard conflates relatedness of the goods and relatedness of the marks into a new "dual use" standard of relatedness. This is yet another Board error. However, even this higher "dual use" standard has been met. What greater evidence of such dual use can exist than Fairmont's use of INSIGNIA as part of its mark? Also, a higher degree of relatedness can be found in Phelps evidence of infusion of cigars with wine, i.e., simultaneous consumption clearly something more than mere use together. Evidence of simultaneous consumption (Appx. 13, 14) was in Phelps 3rd Notice of Reliance relating to infusion of cigars with wine, and in Phelps 2nd Notice of Reliance with articles about pairing of wine and cigars noted by the Board (Appx. 12-13), with contents of the Notice in the record. (Appx. 156-158) Relatedness is also seen in Phelps 6th Notice of Reliance, an article from Cigar Aficionado (Appx. 171-172) entitled "The Art of Wine and Cigars" describing a California winery's storage of cigars in an old wine barrel room, suggesting enjoyment together.

But the Board went into further error, suggesting a *per se* rule that wine and cigars are not related products (Appx. 15), citing <u>In re Opus One, Inc.</u>, 60 USPQ2d 1812, 1814 (TTAB, 2001) stating "the Board concluded that with respect to the mark OPUS ONE for wine and OPUS X for cigars, the marks are not related and/or the goods are not related" (Appx. 15). The Board's quote is from a case where a likelihood of confusion was found between OPUS ONE for restaurant services and OPUS ONE for wine. The quote actually relates to another case having as an exhibit a news article that was a "printout from Wine Spectator magazine which reported on the 1998 dismissal of a trademark infringement action which had been brought by Opus One Winery (presumably the registrant herein) against the

use by Fuente, a Dominican Republic cigar-maker, of the mark OPUS X for cigars…. The article states that, as a result of the decision, Fuente can continue selling its cigars'", with a case footnote that the exhibit was part of trademark prosecution. Wine Spectator reported, according to Board footnote 13 in this case (Appx. 15), that the infringement case was dismissed and from that dismissal the Board justifies the non-relationship of the goods.

Such a *per se* rule is unfounded and erroneous. If indeed there was a dismissal of an infringement case between Opus One and Opus X involving wine and cigars, the dismissal may have had any one of a number of reasons and in all probability had little to do with the relation of wine and cigars. Moreover, Wine Spectator is hardly a journal having a reputation for accurate reporting of legal news. Why, in suggesting a *per se* rule between wine and cigars, did the Board not review *bona fide* case reports in search of reasons for the dismissal of the infringement case to determine whether the dismissal was related to the relationship of wine and cigars? The truth of the matter is that nobody knows why the case reported in Wine Spectator was dismissed. The Opus One case, cited above, a Board decision, in its principal thrust, supports Phelps position because the Board upheld a refusal to register OPUS ONE for restaurant services in view of an OPUS ONE registration for wine. Yet, the Board says that Phelps' case against ALEC BRADLEY STAR INSIGNIA is "similar to" its interpretation of the Wine Spectator report (Appx. 15). For the Board to rely on an exhibit from another case, not involving either party here, with unknown DuPont factors governing the decision, in order to find similarity to issues in this case, particularly in relation to whether the goods are related, is speculative and clearly erroneous. Deference should not be given to the Board's fact finding under these circumstances.

A close reading of In re Opus One, Inc., 60 USPQ2d 1812, 1814 (TTAB, 2001), shows that the Board stated that there was no *per se* rule in that case but that the strong and arbitrary character of Registrant's OPUS ONE mark on wine entitled it to a broad scope of protection that would encompass protection against a user in the field of restaurant services. In this case, the strong and arbitrary character of INSIGNIA on wine, together with evidence of market associations of the two products, should extend protection of Phelps' INSIGNIA registration to cover INSIGNIA used on cigars, with a finding that wine and cigars are closely related goods.

If the Board wanted to rely on factual similarity, Phelps submitted to the Board the case of <u>In re Licores Veracruz</u>, unpublished TTAB decision of January 26, 2012 (Appx. 159-169) regarding application serial no. 77/753,913, where a refusal to register MOCAMBO for rum was sustained, on the same mark registered for cigars in view of the similarity of rum and cigars.  As in this case, there was a finding of complementary products marketed together for simultaneous consumption.  The Board could have also taken note of Phelps' successful opposition against Brohani who was attempting to register INSIGNIAS on cigars (Appx. 39).  Evidence of relatedness by use together (Appx. 14) complementarity (Appx. 12) and simultaneous consumption (Appx. 13, 14) persuasively indicates that the third DuPont factor favors Phelps.

4. <u>The Eleventh DuPont Factor – The Board Ignored Extensive Evidence of Phelps Right to Exclude Others from using INSIGNIA on Wine and Related Goods</u>

In Board opinion footnote 10 (Appx. 8), while addressing the Fifth DuPont factor, the Board states Phelps claim to exclusive rights to INSIGNIA by trademark oppositions is not supported by any evidence, an issue involving the Eleventh DuPont factor. The Board essentially ignores Phelps testimony (Appx. 26, 27) that included a list of oppositions filed. Moreover, Fairmont provided in its TTAB Brief in the cancellation proceeding a discussion of the Phelps oppositions and cancellations (Appx. 39), including a list of *inter partes* cases brought by Phelps over the years where the applicants had diverse goods and services.  Each of the four identified proceedings in the years 2007-2013 lists the opposition number, the filing date of the proceeding, the application opposed, the applicant or registrant, the mark opposed and the status of the proceeding or the result.  In each case an application was withdrawn. (Appx. 39)  These proceedings and the underlying marks that were challenged are a matter of public record and a matter of testimony by Phelps and acknowledgement by Fairmont.  It is not understood how the Board can overlook the existence of this evidence, particularly when noted in the Board opinion (Appx. 4) and when the testimony of Mr. Phelps authenticates the existence of such records (Appx. 26).  The existence of these proceedings, is easily confirmed via online access to the public USPTO website.  The Board could have used judicial notice of its own proceedings to investigate the multiple *inter partes*

actions initiated and claimed by Phelps to protect its INSIGNIA mark, if there was any doubt. The Board erroneously ignored evidence favorable to Phelps in the Eleventh DuPont factor.

B.      The Board Erred as a Matter of Law in Finding No Likelihood of Confusion in Balancing the DuPont Factors

1. Fifth Factor. Phelps has shown by a preponderance of evidence strength of its mark in terms of 35 years of continuous and substantially exclusive use of INSIGNIA on wine. Its INSIGNIA mark has conceptual strength and market strength from notoriety over the years. DuPont Factor Five favors Phelps.

2. First Factor. Phelps has shown an identity, or at least a strong similarity and commercial impression of the marks, such that DuPont Factor One favors Phelps.

3. Second Factor. Phelps has shown and the Board found complementarity of the goods, including use and consumption together, such that DuPont Factor Two favors Phelps.

4. Third Factor. Phelps has shown and the Board found the same of trade channels. The Board reviewed Phelps' evidence that wine and cigars are complementary products that are sold in the same channels of trade (Appx. 12) and that the products are used together (Appx. 13) and that some flavored cigars are infused with wine (Appx. 13). The Board's finding that the products are sold in the same channels of trade (Appx. 12) establishes a similar market for the goods. There is no dispute that the Third DuPont factor weighs in favor of Phelps, although the Board seems to have given little or no weight to this factor, seemingly ignoring the Third DuPont factor.

5. Eleventh Factor. Phelps has shown successful exercise of its right to exclude others from use of the INSIGNIA mark, such that DuPont Factor Eleven favors Phelps.

Some relevant DuPont factors (3rd, 11th) were considered by the Board but seemingly ignored. The Board did not indicate any particular weights to the ignored factors, but seemed to indicate non-relevance, contrary to the enumeration of factors in DuPont. A proper analysis of all relevant DuPont factors clearly balance in favor of Phelps and the order of the

Board should be reversed, with the Fairmont registration of ALEC BRADLEY STAR INSIGNIA cancelled by sustaining Phelps' cancellation petition.

## VIII.   CLARIFICATION OF FAME STANDARD AS FIFTH DUPONT FACTOR

Phelps respectfully requests clarification of the legal standard regarding the fame factor in In re DuPont de Nemours and Co., 476 F.2d 1357 (CCPA, 1973) in light of Palm Bay.  Phelps urges that DuPont fame is at the extreme end of a spectrum of strength.  Every *inter partes* trademark dispute involving the DuPont fifth factor is entitled to a finding, as a matter of law, where possible, of strength on a sliding scale.  In no case should the Board make a determination under the DuPont fifth factor that a mark has no fame.  Such a determination is damaging to trademark owners and is not relevant to a finding of strength on a sliding scale.

Professor Gilson in his treatise, has a section, 5-5 Gilson on Trademarks §5.02[2], describing the likelihood of confusion standard in other circuits, finding that all other circuits treat strength as a principal factor in assessing likelihood of confusion.  Gilson states in §5.10[2], "Each circuit except the Federal Circuit mentions the strength of the plaintiff's mark or the 'type' of mark in its confusion factors." (Appx. 170)  While it is true that other circuits are considering likelihood of confusion in the infringement context, trademark strength considerations in an *inter partes* opposition or cancellation proceeding in the USPTO are similar because the statutory basis for an opposition or cancellation is an assertion of damage by the registration 15 U.S.C. 1063, 1064.  Clarification is needed to indicate that the fifth DuPont factor relates principally to strength, with fame being at one end of the strength spectrum.  See also 4 McCarthy on Trademarks and Unfair Competition §24:30-24:43.

Secondly, times have changed with the passage of the FTDA.  The FTDA creates definition ambiguity regarding fame as a factor in the application of DuPont.  Even though this court's Palm Bay decision distinguishes between FTDA fame and the DuPont fame factor, the Board has confused the two by stating, in non-FTDA cases, that a particular trademark has no fame.  Palm Bay and other explanatory cases describe a sliding scale of strength to be applied, meaning that the strength of the mark is to be measured in a quantitative manner and that fame is not a binary nor an either/or proposition.  This Court

has previously interpreted "fame" as "strength" in applying the DuPont case, see <u>Stone Lion Capital Partners, LP v. Lion Capital, LLP</u>, 746 F.3d 1317 (Fed. Cir., 2014). When the Board itself, an esteemed body of experts, states that a mark lacks fame, particularly when citing Palm Bay, it appears that the law of this Circuit is not clear or misapplied or that deleterious shorthand is being used that creates havoc for trademark owners. Such a shorthand implies that some threshold amount of fame was not met. Although the Supreme Court recently noted in <u>B&B Hardware v. Harges Ind.</u>, 575 U.S. _____, 135 S. Ct. 1293 at 1307 that likelihood of confusion tests in various circuits are not fundamentally different, a clarification that establishes strength on a sliding scale as a primary factor in determining likelihood of confusion in *inter partes* cases in the Federal Circuit is needed.

## IX.    CONCLUSION AND RELIEF SOUGHT

Phelps has shown by a preponderance of the evidence that the Board misinterpreted the Fifth DuPont factor and that Phelps INSIGNIA mark should have at least strong strength, if not fame, in its industry so that the Fifth Factor favors Phelps.

Phelps has shown by a preponderance of evidence how the USPTO erroneously examined Fairmont's word mark as a design mark leading to an improper analysis of INSIGNIA and an improper comparison for judging similarity of the marks. The variance between the word mark applied for and the specimen submitted is so great that the Fairmont registration is invalid.

Phelps has shown by a preponderance of the evidence that the marks are similar, related with complementarity of the goods, including use together, with similar channels of trade and that Phelps has exercised a right to exclude others from using a confusingly similar mark so that other DuPont factors favor Phelps.

"Any doubts about likelihood of confusion… must be resolved against … the newcomer." <u>Century 21 Real Estate Corp. v. Century Life of America</u>, 970 F.2d 874 (Fed. Cir., 1992).

Lastly, Phelps respectfully requests that this Court clarify <u>In re DuPont de Nemours & Co.</u>, 476 F.2d 1357 (CCPA, 1973), particularly in TTAB *inter partes* cases, where a rule that explicitly states that a sliding scale of strength is applicable for the claimant's mark is required, where the fifth DuPont factor is being evaluated.

For the reasons set forth above, Appellant Joseph Phelps Vineyards, LLC respectfully requests that this Court reverse the holding of the Trademark Trial and Appeal Board Cancellation No. 92057240 and cancel and invalidate U.S. Trademark reg. no. 4,213,619.

Respectfully submitted,

/s/  Thomas Schneck
Attorney for Appellant – Cancellation Petitioner

Law Offices of Thomas Schneck
80 So. Market Street, 3rd Floor
P.O. Box 2-E
San Jose, CA  95109
(408) 297-9733

November 17, 2015

# ADDENDUM

THIS OPINION IS NOT A
PRECEDENT OF THE TTAB

Mailed:
July 6, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Joseph Phelps Vineyards, LLC*
*v.*
*Fairmont Holdings, LLC*
_____

Cancellation No. 92057240
Registration No. 4213619
_____

Thomas Schneck of Law Office of Thomas Schneck
    for Joseph Phelps Vineyards, LLC.

Kimberly Koblack of Law Offices of Kimberly Koblack
    for Fairmont Holdings, LLC.
_____

Before Zervas, Ritchie and Gorowitz Administrative Trademark Judges.

Opinion by Gorowitz, Administrative Trademark Judge:

Joseph Phelps Vineyards, LLC ("Petitioner") has petitioned to cancel a registration owned by Fairmont Holdings LLC, ("Respondent") for the mark ALEC BRADLEY STAR INSIGNIA in standard characters for "cigars, tobacco, cigar boxes, cigar cutters and cigar tubes" in Class 34.[1] The term STAR INSIGNIA is disclaimed in the registration. Petitioner is the owner of Registration No. 1123429 for the mark

---

[1] Registration No. 4213619, issued on September 25, 2012.

INSIGNIA (in typed form)[2] for "wines" in Class 33.[3] Petitioner also asserts common-law use of the INSIGNIA mark for over thirty (30) years. The petition alleges likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d).

Respondent filed an answer denying all salient allegations in the notice of opposition and asserting eight affirmative defenses. However, Respondent did not present arguments or evidence in support of the affirmative defenses. Thus, they are deemed waived.

The case has been fully briefed.

**The Record**.

The record includes the pleadings, and by operation of Trademark Rule 2.122(b), 37 CFR § 2.122(b), the file of the registration sought to be cancelled. The parties stipulated to the introduction of testimony by declarations and through notice of reliance. Subject to this stipulation, the parties introduced the following:

---

[2] Effective November 2, 2003, Trademark Rule 2.52, 37 C.F.R. §2.52, was amended to replace the term "typed" drawing with "standard character" drawing. Applicants who seek to register a mark without any claim as to the manner of display must submit a standard character drawing that complies with the requirements of Trademark Rule 2.52(a), 37 C.F.R. §2.52(a).

[3] Registration No. 1123429 issued on July 31, 1979; second renewal June 20, 2009.

A. Petitioner's evidence.[4]

1. Webpages of third-parties for establishments selling both wine and cigars (Notice of Reliance 1);

2. Webpages of third-parties related to wine and cigar pairings (Notice of Reliance 2);

3. Webpages of third-parties related to flavored cigars (Notice of Reliance 3);

4. Certified copy of pleaded Registration No. 1123429 (Notice of Reliance 4);

5. Copy of specimen from registration file of Registration No. 4213619 (Notice of Reliance 5);

6. Article from October 21, 2013 issue of CIGAR AFICIONADO entitled *The Art of Wine and Cigars* (Notice of Reliance 6);

7. Webpages of third-parties regarding Respondent's ALEC BRADLEY STAR INSIGNIA products (Notice of Reliance 7); and

8. Declaration of William H. Phelps, President and CEO of Petitioner and exhibits thereto (Phelps Dec.).

B. Respondent's evidence.

1. Declaration of Alan Rubin, President of Respondent and exhibits thereto (Rubin Dec.);

2. Petitioner's responses to Respondent's first set of interrogatories (Notice of Reliance A);

3. Petitioner's responses to Respondent's first request [sic] for admission (Notice of Reliance B);

---

[4] Petitioner submitted its evidence by mailing a paper copy to the USPTO. The documents were out of order, e.g. the first notice of reliance is at 11 TTABVUE 3 - 4 and 78 -472; the second notice of reliance is at 11 TTABVUE 5 - 6 and 55 - 77; the third notice of reliance is at 11 TTABVUE 7 and 20 - 76; and the seventh notice of reliance is at 11 TTABVUE 17 - 19. A number of the pages are oriented in different directions and a number of pages are barely legible.

4. Petitioner's List of Cancellations/Oppositions Filed (Notice of Reliance C);

5. Copy of Registration No. 1394292 for the mark COACH INSIGNIA from USPTO database, specimen from registration file and various unauthenticated webpages (Notice of Reliance D); and

6. Copy of documents from USPTO database relating to Application No. 86182796 including specimen and various webpages (Notice of Reliance E).

**Standing.**

Petitioner has made its pleaded registration of record showing it is extant and owned by Petitioner, and further has shown, evidence of its use of the pleaded mark for the goods in recited in the registration. Petitioner therefore has established that it has a personal stake in the outcome of this proceeding. Based thereon, we find that Petitioner has established its standing. *See Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

**Priority.**

Since both Petitioner and Respondent own registrations, priority is at issue. *See King Candy Company v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). Therefore, petitioner must establish that it has prior rights in its mark. *Brewski Beer Co. v. Brewski Brothers Inc.*, 47 USPQ2d 1281, 1284 (TTAB 1998). Petitioner may rely not rely on the first use date set forth in its registration but may, for this purpose, rely on the filing date of its application which issued into its pleaded registration. *See Levi Stauss & Co. v. R. Josephs Sportswear Inc.,* 28

USPQ2d 1464, 1467(TTAB 1993) (without proof of use, application filing date not dates of use alleged in the application is the earliest use date on which the applicant may rely), *recon. denied,* 36 USPQ2d 1328 (TTAB 1994).

As noted, Petitioner has made of record its registration for the mark INSIGNIA for wines, Registration No. 1123429, which issued on July 31, 1979 from an application filed on July 19, 1978.

Respondent's registration, which is the subject of this proceeding, issued from a use-based application, Serial No. 85544573 that was filed on February 16, 2012 and which alleged use since December 1, 2010. Respondent did not introduce evidence establishing use of the mark ALEC BRADLEY STAR INSIGNIA prior to December 1, 2010, but its President, Alan Rubin, testified that "ALEC BRADLEY INSIGNIA and STAR INSIGNIA have been in use since as early as December 1, 2010." Rubin Dec. par. 22, 12 TTABVUE 4. Petitioner's underlying application was filed prior to both Respondent's asserted first use in 2010 and the filing date of Respondent's application. Therefore, Petitioner has priority. *See Brewski*, 47 USPQ2d at 1284 (Petitioner or Respondent may rely on its registration for the limited purpose of proving that its mark was in use as of the application filing date).

**Likelihood of Confusion.**

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also, In re Majestic Distilling Co., Inc.,* 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir.

2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and/or services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24 (CCPA 1976). *See also In re Dixie Restaurants Inc.,* 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997).

### The fame of Petitioner's mark.

We start our analysis with the fifth *du Pont* factor, the fame of the prior mark. Fame for confusion purposes arises as long as a significant portion of the relevant consuming public … recognizes the mark as a source indicator." *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F3d 1369, 73 USPQ2d 1689, 1695 (Fed. Cir. 2005). Petitioner defines its customers as "every type and class of consumer and end user that appreciates fine wine, or is capable of appreciating fine wine."[5] Thus, and considering that petitioner's identification of goods extends to all "wine," the relevant consuming public consists of those who purchase wine.

To establish recognition of its mark, Petitioner testified that its predecessor's first use of the mark INSIGNIA for wine was in the spring of 1978 when it released several hundred cases for sale across the United States. Phelp's Dec., par. 4, 11 TTABVUE 474. Since 2000, sales of its INSIGNIA wine have "ranged between 10,000 to 15,000 cases per year representing revenue between $13 million to $20 million per year." *Id.,* par. 7. Petitioner also testified that it sells its product through

---

[5] Respondent's Notice of Reliance A – Petitioner's response to interrogatory no. 3B9, 14 TTABVUE 10.

"wine distributors, directly to house accounts that are mainly restaurants and bars, through a JBV Wine Club … and through a company store at the JBV winery. Wine distributors sell mainly to stores, restaurants, hotels, bars and other retailers." Phelp's Dec., par. 8, 11 TTABVUE 475. Information about INSIGNIA wine appears on Petitioner's website, www.josephphelps.com, and the wine can be purchased thereon. *Id.* par. 9. Petitioner further testified that its 2005 INSIGNIA wine won the WINE SPECTATOR[6] wine of the year award, and that its "JPV INSIGNIA wine" has appeared in "dozens, if not hundreds of news articles" over the years. *Id.* pars. 14 - 15, 11 TTABVUE 476. In particular, Petitioner refers to "newsworthy" newspaper articles in the October 13, 1993 issues of NY Times and San Jose Mercury News. *Id.,* Par. 15. While Petitioner's INSIGNIA wine was mentioned in both articles, the articles were not about Petitioner's wine. The subject matter of the NY Times article entitled *Wine Talk,* is the benefit of California wine makers using proprietary names [trademarks], namely to "blend grapes as they see fit" rather than identifying the wine solely by the grapes from which it is made [7] In particular, the author discusses Joseph Phelps, the creator of the first blended grape wine and his use of trademarks, including INSIGNIA, EISELE, and BACKUS.[8] A similar

---

[6] According to Petitioner, "WINE SPECTATOR is a popular monthly magazine for wine lovers." *Id.* par. 14, 11 TTABVUE 476.

[7] Frank J. Prial, *Wine Talk,* N.Y. TIMES, October 13, 1993. Exhibit I to Phelps Dec., 11 TTABVUE 704.

[8] *Id.*

subject is discussed in the article from the San Jose Mercury News, which is entitled *Phelps is pioneer of Bordeaux blend.*"[9]

As such, while it appears that Petitioner's INSIGNIA branded wine has met with success in the marketplace, we are not persuaded on this record that Petitioner's mark is a famous mark.[10]

### The similarity or dissimilarity of the marks.

Next, we look at the first *du Pont* factor, the similarity or dissimilarity of the marks. In comparing the marks we must consider the appearance, sound, connotation and commercial impression of the marks in their entireties. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 73 USPQ2d at 1692. While "the similarity or dissimilarity of the marks is determined based on the marks in their entireties … there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties." *In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985).

To evaluate the similarities between marks, the emphasis must be on the recollection of the average purchaser who normally retains a general, rather than

---

[9] Anthony Dias Blue, *Phelps is pioneer of Bordeaux blends,* SAN JOSE MERCURY NEWS, October 13, 1993. Exhibit J to Phelps Dec., 11 TTABVUE 707.

[10] Petitioner also argues that it has acquired exclusive rights by policing its mark. The evidence introduced consists of cease and desist letters sent to three companies in 2006 and 2007; and follow-up letters regarding one of the companies. Petitioner's reference to four oppositions is not supported by any evidence and hence is not further considered. Petitioner's cease and desist and follow up letters only reflect limited policing efforts.

specific, impression of trademarks. *In re Cynosure, Inc.*, 90 USPQ2d 1644, 1645 (TTAB 2009), citing *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106, 108 (TTAB 1975).

In this case Petitioner's mark consists solely of word, INSIGNIA while Respondent's mark is the composite phrase, ALEC BRADLEY STAR INSIGNIA, which is in standard character format.[11] Petitioner argues that in Respondent's mark, the word INSIGNIA is larger than the preceding word STAR. Because the depiction of the mark is in standard character format and Respondent is not limited to any particular presentation, the format in which Respondent currently uses its mark is not at issue.

Petitioner contends that the dominant part of Respondent's mark, which should be afforded greater weight, is the word INSIGNIA. We disagree. As viewed in its entirety, Respondent's mark consists of its house mark, ALEC BRADLEY, and the unitary term STAR INSIGNIA.

> There have been numerous cases over the years that have reached different conclusions on whether the addition of a house mark avoids confusion. It has long been held that the addition of a trade name or house mark to a registered mark does not generally avoid confusion. *Menendez v. Holt*, 128 U.S. 514, 521 (1888). "However, there is no arbitrary rule of law that if two product marks are confusingly similar, likelihood of confusion is not removed by use of a company or house mark [sic] in association with the product mark." *New England Fish*

---

[11] Registrations in standard character format are "federal mark registrations that make no claim to any particular font style, color, or size of display and, thus, are not limited to any particular presentation." *Citigroup Inc. v. Capital City Bank Group Inc.,* 637 F3d 1344, 98 USPQ2d 1253, 1256 (Fed. Cir. 2011).

> *Company v. The Hervin Company*, 511 F.2d 562, 184
> USPQ 817, 819 (CCPA 1975) (BLUE MOUNTAIN KITTY
> O's and KITTY not similar). In these cases, we must, of
> course, consider the entire marks, including the presence
> of the house mark in applicant's mark in light of the
> evidence of record.

*In re Fiesta Palms LLC*, 85 USPQ2d 1360, 1364 (TTAB 2007). Generally, if the product marks are identical, the addition of the house mark does not avoid confusion, however, "where there are some recognizable differences in the asserted product marks …the addition of a house mark and/or other material to the assertedly conflicting product mark has been determined to render the marks as a whole sufficiently distinguishable." *Id.,* quoting *In re Christian Dior, S.A.,* 226 USPQ 533, 534 (TTAB 1985). In this case, since there are recognizable differences in the product marks, STAR INSIGNIA and INSIGNIA, the house mark ALEC BRADLEY does distinguish the marks. *See In re Avent, Inc.,* 195 USPQ 185, 187 (TTAB 1977) (no likelihood of confusion between CHANNEL MASTER CHROMA-KING for television antennas and COLOR KING for television picture tubes). Moreover, the product mark, STAR INSIGNIA is a unitary phrase with the word "star" modifying "insignia." "Insignia" is defined as:

> 1: a badge of authority or honor;
>
> 2: a distinguishing mark or sign.[12]

Thus, the commercial impression of Opposer's mark INSIGNIA is simply an "insignia" or mark, and the commercial impression of Applicant's mark ALEC

---

[12] We take judicial notice of the definition of "insignia" from *Merriam-Webster* on-line, http://www.merriam-webster.com/dictionary/insignia.

BRADLEY STAR INSIGNIA is one of a star shaped mark or sign identifying the source of a product produced by ALEC BRADLEY.

Based thereon, we conclude that the marks, as viewed in their entireties, differ in appearance, sound, connotation and commercial impression.

### The similarity or dissimilarity of the parties' goods.

Next, we consider the similarity or dissimilarity of the parties' goods. It is well established that in a proceeding such as this, the similarity of the goods must be determined on the basis of the goods as identified in the registration. *See Canadian Imperial Bank of Commerce v. Wells Fargo Bank, NA,* 811 F.2d 1490, 1 USPQ2d 1813, 1814 (Fed. Cir. 1987). *See also Stone Lion Capital Partners, LP v. Lion Capital LLP,* 76 F.3d 1317, 110 USPQ2d 1157, 1161 (Fed. Cir. 2014); *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002); *Octocom Sys., Inc. v. Houston Computers Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990).

Further, when analyzing the similarity of the goods, it is not necessary that the products of the parties be similar or even competitive to support a finding of likelihood of confusion. Instead, likelihood of confusion can be found "if the respective products are related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that they emanate from the same source." *Coach Services Inc. v. Triumph Learning LLC*, 668 F3d 1356, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012).

Petitioner argues that wine and cigars are complementary products and as such are related.

To establish that wine and cigar are complementary products, Petitioner submitted documents from numerous websites which advertise or promote cigar bars, cigar stores, wine bars, wine stores and events featuring wine and cigars. This evidence establishes that the products are sold in the same channels of trade. See for example,

> The Cigar Bar and Grill (www.cigarbarandgrill.com) website states that "The Cigar Bar and Grill is more than just a smoking bar – we're also a wine bar." Wines are listed on the first four pages of the exhibit (pages 88-92) followed by promotional information regarding events. Four brands of cigar are listed on the last two pages of the exhibit (pages 97-98). Petitioner's First Notice of Reliance, 11 TTABVUE 88 – 98'

> Old Oaks Cigar & Wine Co. (http://neighborhoodinc.org/ California-Directory-Coupons/old-oaks-cigar-wineco). This site also separates sales of cigars from sales of wine and other liquor: "Welcome to the Old Oaks Cigar & Wine Company website. We have been serving the Conejo Valley since 1996 with premium handmade cigars from manufacturers such as Cohiba, Asthon, Partagas, Punch, and many more. We carry a wide selection of humidors, ashtrays, lighters, and other cigar accessories for your smoking experience. We also have a long list of fine wines from many local and private vineyards and a wide selection of single malt scotch, rums, brandies and tequilas." - Petitioner's First Notice of Reliance, 11 TTABVUE 114;

> Everything Wine & Cigars, retail, bar and bistro (http://everythingwineandcigars.com) whose website indicates that it sells cigars. There are five pages of wines listed at the end of the site. Petitioner's First Notice of Reliance, 11 TTABVUE 119 -125;

> Renwood Winery (http://plymouthcalifornia.com/amador-sierra-foothill-wineries/winetasting/116--winery-of-t) a winery that sells "a selection of Renwood merchandise, gift items and its [own] Renwood cigars" in its giftshop

> Petitioner's Second Notice of Reliance, 11 TTABVUE 65 –
> 68;
>
> Bellaterra Ranch (http://www.bellaterraranch.com/
> storefront/cms.php?id), which produces wine at its ranch
> in Sonoma, California and cigars in Nicaragua -
> Petitioner's Second Notice of Reliance, 11 TTABVUE 75 –
> 77; and
>
> Marco V Cigar Wine (www.marcovcigars.com/
> MarcoVCigarWine.html) cigar company that co-brands
> cigars with wine (THE VINTAGE wine from Chateau St.
> Croix Winery), coffee, (DOM CAFÉ coffee), and infused
> cigars (INFUZE cigars) - Petitioner's Third Notice of
> Reliance, 11 TTABVUE 33.

Petitioner also submitted evidence of sales of flavored cigars, which are infused

with different flavorings, including wine. Examples of flavored cigars include:

- CF Dominicana, which makes its own Gourmet
  Cigars which are the 'CF Dominicana' cigars with
  added Vanilla, Amaretto, Cognac Chocolate or
  Wine extract – http://www.cfcigars.com/
  flavoredcigars.htm - Petitioner's Third Notice of
  Reliance, 11 TTABVUE 21;

- Game Cigars by Garcia Vega, which are "among
  the most popular brands in the United States …
  the Honey, Vanilla, the newer Wine, Peach, and
  White Grape selections are flavored cigars" –
  http://www.famous-smoke.com/grand/
  garcia+y+vega+game+cigars - Petitioner's Third
  Notice of Reliance, 11 TTABVUE 24 - 25; and

- Guy & Lady Barrel, which are "[h]and rolled
  Dominican tobacco aged in American white oak
  barrels infused with alcohol…Bourbon, Whiskey,
  Orange Brandy, Apple Brandy, Spice Rum, Port
  Wine, Golden Mead, and Apple Pie Moon Shine –
  www.guyandladybarrel.com/Products.html -
  Petitioner's Third Notice of Reliance, 11 TTABVUE
  35.

- "Messina Hof Private Reserve Papa Paulo Port" – Hight Cigars infused with Messina Hof Port - Petitioner's Second Notice of Reliance, 11 TTABVUE 57;

- "Reserva Decadencia" – Toraño Cigars infused with Wilson Creek Winery's Decadencia Chocolate Port – Petitioner's Second Notice of Reliance, 11 TTABVUE 59; and

- Santiago Cigars infused with Deer Run Winery's "Noiret" and "Dockside" - Petitioner's Second Notice of Reliance, 11 TTABVUE 68.

The evidence suggests that cigars and wine can be used together. However, there is negligible evidence of use of the same mark on both cigars and wine.

> As the Federal Circuit observed, "used together" is not alone determinative, but must be considered in the overall mosaic of evidence: The test is not that the goods and services must be related if used together but merely that that finding is part of the underlying factual inquiry as to whether the goods and services at issue… can be related in the mind of the consuming public as to the origin of the goods. Thus, the mere fact that two goods are used together in the same setting or venue does not, in and of itself, demand a finding that confusion is likely.

4 McCarthy on Trademarks and Unfair Competition § 24:26 (4th ed.) (2015). *See*

*Shen Mfg. Co. Inc. v. Ritz Hotel, Ltd.,* 393 F.3d 1238, 73 USPQ2d 1350, 1355 (Fed. Cir. 2004) (No likelihood of confusion between RITZ for kitchen towels and aprons and RITZ for cooking classes, even though the goods and services are used together). In this case, the products differ in numerous ways, including the differences in the raw ingredients used to manufacture the products, the differences in the methods of manufacture and the negligible amount of evidence of use of the same mark on both cigars and wine. In light of these differences, and the minimal

evidence of a single source of both goods, we are not persuaded by Petitioner's arguments that the goods are related. Moreover, the facts in this case are similar to the infringement case discussed by the Board in *In re Opus One Inc.*, 60 USPQ2d 1812, 1814 (TTAB 2001), wherein the Board concluded that with respect to the marks OPUS ONE for wine and OPUS X for cigars, the marks are not related and/or the goods are not related. [13]

Thus, the evidence suggests that the goods are sold in the same channels of trade to the same purchasers but does not establish a relationship between the goods.

### The conditions under which and the buyers to whom sales are made.

Respondent argues that "wine drinkers and cigar smokers are sophisticated purchasers. Respondent bases it argument regarding the sophistication of wine drinkers on evidence that Petitioner's INSIGNIA wine costs between $158.00 - $275 per 750 ml bottle[14] and on Respondent's assertion that "[d]rinkers of wine this expensive are going to be familiar with and knowledgeable regarding the Joseph Phelps Vineyard's origin of this costly wine when purchasing it." Respondent's Brief, p. 15, 17 TTABVUE 16. Respondent bases its argument regarding the

---

[13] The Appeal involved Applicant's mark OPUS ONE for restaurant services and Registrant's mark OPUS ONE for wine. While finding likelihood of confusion, in its discussion of the sixth *du Pont* factor (the number and nature of similar marks in use on similar goods), the Board noted the 1998 dismissal of an infringement action by Opus One Winery against the use by Fuente of OPUS X for cigars. From this dismissal, the Board concluded that OPUS X and OPUS ONE are not similar marks and/or that cigars and wine are not similar goods.

[14] Respondent's Second Notice of Reliance – Response to Interrogatory No. 2, 15 TTABVUE 8.

sophistication of smokers of its cigars on the declaration of Alan Rubin, President of Respondent. *Id.* In his declaration, Mr. Rubin testifies that "Alec Bradley is a highly reputable manufacturer, producer, seller and distributor of quality cigars …"[15] and that in his opinion: "ALEC BRADLEY cigars are considered to be cigars of high quality;"[16] "ALEC BRADLEY STAR INSIGNIA cigars are considered to be cigars of high quality";[17] "Smokers of high quality cigars are sophisticated consumers;"[18] "Smokers of ALEX BRADLEY cigars are sophisticated consumers";[19] and "Smokers of ALEX BRADLEY STAR INSIGNIA cigars are sophisticated consumers."[20]

While we acknowledge that the parties target sophisticated customers, we are constrained to consider the parties' goods as they are identified in the relevant registrations. *See Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1160 (Fed. Cir. 2014). Neither party's goods are restricted to "expensive" or "high-end" products and thus, we must consider the sophistication of all potential consumers of wine and cigars, including those who purchase "inexpensive," "low-end" products."

### No actual confusion.

Respondent argues that despite concurrent use of their respective marks for a period of over four years, neither Petitioner nor Respondent has encountered

---

[15] Rubin Dec., par. 4, 12 TTABVUE 2.

[16] Rubin Dec., par. 26, 12 TTABVUE 4.

[17] Rubin Dec., par. 27, 12 TTABVUE 4.

[18] Rubin Dec., par. 29, 12 TTABVUE 4.

[19] Rubin Dec., par. 30, 12 TTABVUE 4.

[20] Rubin Dec., par. 31, 12 TTABVUE 4.

evidence of confusion. While a showing of actual confusion would of course be highly probative, if not conclusive, of a high likelihood of confusion, the opposite is not true. The lack of evidence of actual confusion carries little weight, *J.C. Hall Co. v. Hallmark Cards, Inc.*, 340 F.2d 960, 964, 144 USPQ 435, 438 (CCPA 1965).

**Conclusion.**

Having considered all the evidence and argument on the relevant *du Pont* factors, whether specifically discussed herein or not, we conclude that, particularly in light of the differences in the marks and the differences in the goods, there is no likelihood of confusion between Petitioner's use of the mark INSIGNIA for wine and Respondent's use of the mark ALEC BRADLEY STAR INSIGNIA for cigars, tobacco, cigar boxes, cigar cutters and cigar tubes.

**Decision**: The petition for cancellation on the ground of likelihood of confusion under Section 2(d) of the Trademark Act is denied.

CERTIFICATE OF FILING AND SERVICE

By U.S. Mail and Electronic Transmission

I HEREBY CERTIFY that on this 17th day of November, 2015 I caused this Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

.

Kimberly Kolback
Law Offices of Kimberly Kolback
1395 Brickell Avenue, Suite 800
Miami, FL  33131

Miriam Richter
Richter Trademarks, P.L.
2312 Wilton Drive, Ste. 9
Wilton Manors, FL  33305

Upon acceptance by the Clerk of the Court of the electronically filed document, the required six copies of the Brief of Appellant will be filed at the Office of the Clerk, United States Court of Appeals for the Federal Court in accordance with the Federal Circuit Rules and two copies will be served, by Express Mail, on the above identified counsel for Appellee at the addresses above with two copies to:

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8
P.O. Box 1450
Alexandria, VA  22213-1450

Date: Nov. 17, 2015

/s/Thomas Schneck
_____
Attorney for Appellant